

Neutral
As of: November 27, 2013 1:25 PM EST

# Hana Fin., Inc. v. Hana Bank

United States Court of Appeals for the Ninth Circuit

August 9, 2013, Argued and Submitted, Pasadena, California; November 22, 2013, Filed

No. 11-56678

**Reporter:** 2013 U.S. App. LEXIS 23507; 2013 WL 6124588

HANA FINANCIAL, INC., a California corporation, Plaintiff-Appellant, v. HANA BANK, a Korean corporation; HANA FINANCIAL GROUP, a Korean corporation, Defendants-Appellees.

**Prior History:** [*1] Appeal from the United States District Court for the Central District of California. D.C. No. 2:07-cv-01534-PA-JWJ. Percy Anderson, District Judge, Presiding.
Hana Fin., Inc. v. Hana Bank, 2011 U.S. Dist. LEXIS 70096 (C.D. Cal., June 29, 2011)

**Disposition:** AFFIRMED.

---

| Case Summary |
| --- |

## Overview

HOLDINGS: [1]-Where a California financial company alleged that a Korean bank infringed its trademark and a jury found in favor of the bank as to the bank's trademark priority, it was permissible for the jury to find that the bank could "tack" its use of its present "Hana Bank" mark to its use of its previous "Hana Overseas Korean Club" mark because the jury could reasonably conclude that throughout the time period at issue, the ordinary purchasers of the financial services had the continuous impression that the advertised services were being offered by the bank and that there were no material differences between the marks, and the ordinary purchasers could perceive the bank's marks as conveying the same idea or meaning or evoking the same mental reaction; [2]-The abandonment argument under *15 U.S.C.S. § 1127* was rejected for the same reasons that the tacking arguments were unavailing.

## Outcome

Decision affirmed.

**Counsel:** Steven E. Shapiro (argued), Kim, Shapiro, Park, & Lee, Los Angeles, California, for Plaintiff-Appellant.

Carlo F. Van den Bosch (argued), Robert D. Rose, and Michelle LaVoie Wisniewski, Sheppard Mullin Richter & Hampton LLP, Costa Mesa, California, for Defendant-Appellee.

**Judges:** Before: Richard C. Tallman, Richard R. Clifton, and Consuelo M. Callahan, Circuit Judges. Opinion by Judge Callahan.

**Opinion by:** Consuelo M. Callahan

2013 U.S. App. LEXIS 23507, *1

| Opinion |
| --- |

CALLAHAN, Circuit Judge:

**HN1** A party claiming trademark ownership must establish that it was the first to use the mark in the sale of goods or services. This concept is known as trademark "priority." One of the ways that a party may establish priority is through the constructive use doctrine known as "tacking." Tacking allows a party to "tack" the date of the user's first use of a mark onto a subsequent mark to establish priority where the two marks are so similar that consumers would **[*3]** generally regard them as being the same.

We have previously indicated that **HN2** tacking only applies in "exceptionally narrow" circumstances, *Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036, 1047 (9th Cir. 1999)*, and is properly resolved "as a matter of law if reasonable minds cannot differ and the evidence permits only one conclusion," *One Industries, LLC v. Jim O'Neal Distribution, Inc., 578 F.3d 1154, 1160 (9th Cir. 2009)*. Nonetheless, the rule in our circuit is that tacking "requires a highly fact-sensitive inquiry" generally reserved for the jury. *Id.* On the facts of this case, we conclude that the properly-instructed jury was entitled to find that the doctrine applied.

I

A

The Korean word pronounced as "hana" means "number one," "first," "top," or "unity." The parties in this dispute both use the English word "Hana" in their names and offer financial services in the United States. Defendant-Appellee Hana Bank (the "Bank") is a Korean entity established in 1971 as Korea Investment Finance Corporation.[1] In 1991, it adopted its current name. Presently, it is the fourth largest bank in Korea. Plaintiff-Appellant Hana Financial, Inc. ("HFI") is a California **[*4]** corporation that was incorporated on August 15, 1994.

The principals of the two entities were no strangers. The Bank's Chairman, Seoung-Yu Kim, and HFI's former CEO, Charles Kim, met for the first time in 1985 and met at least once per year thereafter until 2002, when Charles Kim became seriously ill. During that time period, Charles Kim affectionately referred to Seoung-Yu Kim as "big brother." Seoung-Yu Kim also knew HFI's current CEO, Sunnie Kim,[2] and met with her annually from 2004 through 2006.

In 1991, Charles Kim and Sunnie Kim were working at an American bank. At that time, the Bank was considering offering services to Korean Americans living in Los Angeles through a partner. Charles Kim and Sunnie Kim met **[*5]** with Seoung-Yu Kim to discuss a potential equity investment and strategic alliance. To that end, the companies executed a non-binding memorandum of understanding. The deal, however, was never completed. It was initially delayed by regulatory issues, and after the 1992 Los Angeles riots, the Bank decided it would take a "wait and see" approach.

In May 1994, the Bank acted on its plan to extend its services to the United States, establishing

---

[1]   Hana Financial Group, a defendant in the underlying action, was incorporated as the Bank's holding company in 2005, but it does not provide services in the United States or direct the Bank's activities in the United States. The district court dismissed it from the action at the close of evidence, and we do not understand HFI's appeal to encompass that ruling.

[2]   "Kim" is a very common surname in Korea and among Korean Americans. The individuals discussed here are not related.

2013 U.S. App. LEXIS 23507, *5

the "Hana Overseas Korean Club" (the "Club") to provide financial services to Korean expatri-
ates. The Club's target customer base consisted of Korean Americans living in the United States,
particularly in certain areas, such as Southern California, New Jersey, Chicago, and San Fran-
cisco. That July, the Bank published advertisements for the Club in several Korean-language news-
papers in major cities throughout the United States, including the Los Angeles edition of the Ko-
rea Times. The advertisements included the name "HANA Overseas Korean Club" in English.
The names "Hana Overseas Korean Club" and "Hana Bank" also appeared in Korean, along with
the Hana Bank logo, which is sometimes called the "dancing man." The dancing man logo has
not changed since [*6] then. The Bank subsequently received a number of applications for the Club
from customers in the United States. The application materials included the name "Hana Over-
seas Korean Club" in English and "Hana Bank" in Korean next to the dancing man logo.

HFI came into existence one month later. Its Articles of Incorporation indicated that it could en-
gage in lawful acts "other than the banking business." It began using its trademark in com-
merce the following year, on April 1, 1995. On July 16, 1996, it obtained a federal trademark reg-
istration for a pyramid logo with the words "Hana Financial" for use in connection with
factoring[3] and certain other financial services. HFI advertised in Korean-language newspapers (in-
cluding the Los Angeles edition of the Korea Times), other major newspapers, and on televi-
sion. Its customers were primarily Korean Americans, but its customer base eventually expanded
to include non-Korean Americans, who may have even constituted a majority of its customers
at the time of trial.

In 1995, Charles Kim showed Seoung-Yu Kim a copy of his HFI business card. Seoung-Yu Kim
asked Charles Kim why he was using the "Hana" mark without permission. Charles Kim stated
that he thought it was a "wonderful" name. He explained that HFI would only be engaged in fac-
toring and would not be providing banking services, so there would be no overlap in the two com-
panies' services.

Meanwhile, the Bank continued operating the Club in the United States. Its initial customers in-
cluded individuals in several states, at least one of whom remained a customer through the time of
the trial. From 1994 onward, the Bank wired money to its customers in the United States "al-
most every day" — totaling over $37 million between 2002 and 2007 — and accepted over 11,500
applications. In 2000, the Bank changed the Club's name to the "Hana World Center."

In 2001, the Bank sought to register its trademark but was unable to do so, at least in part due
to HFI's mark. The Bank contacted HFI about the issue, but they were unable to resolve it. In 2002,
the Bank began operating an agency in New York under its own [*8] name.

B

On March 8, 2007, HFI filed its complaint alleging trademark infringement and related claims.
In essence, HFI contended that the Bank's use of its "Hana Bank" mark infringed HFI's "Hana Fi-
nancial" mark because its use of the word "Hana" in connection with financial services would
likely cause confusion. In response, the Bank sought cancellation of HFI's trademark based on
HFI's alleged awareness of the Bank's superior rights, and the Bank also asserted the equitable de-
fenses of laches and unclean hands. On January 7, 2008, the district court granted the Bank's mo-
tion for summary judgment on trademark priority. The district court also granted HFI's motion
for summary judgment on the Bank's cancellation counterclaim. Both parties appealed.

---

[3]   "Factoring" refers to accounts receivable management. Essentially, companies like HFI loan money to their clients, who are
manufacturers, based on the manufacturers' purchase orders, [*7] and then collect the money from the buyers. The buyers' prom-
issory notes may be sold as securities.

2013 U.S. App. LEXIS 23507, *8

On October 4, 2010, we reversed on priority, finding that the Bank's advertisements and other exhibits purportedly demonstrating priority were "relevant," but were also subject to competing inferences or were not presented in admissible form. Hana Fin., Inc. v. Hana Bank, 398 Fed. App'x 257, 258-59 (9th Cir. 2010). Accordingly, we remanded for trial. *Id.* at 259. We also affirmed the district court's grant of summary judgment on the Bank's cancellation **[*9]** counterclaim, noting that HFI's alleged knowledge of the Bank's mark was insufficient to establish the requisite element of fraudulent intent. *Id.*

On remand, HFI filed a motion in limine seeking to exclude the Club advertisements and related exhibits, arguing that the evidence was irrelevant. Specifically, it argued: (a) that the Bank's mark and the Club's mark were not virtually identical and therefore, tacking for the purposes of establishing trademark priority was improper; and (b) in the alternative, that the Bank had abandoned the mark in 1999 or 2000. The district court denied the motion.[4]

The trademark infringement claims were triable by jury and the court also submitted the Bank's laches and unclean hands defenses to the jury for an advisory verdict. The trial commenced on May 24, 2011. At the close of evidence, HFI moved for judgment as a matter of law arguing that the Defendants had presented "no evidence" on trademark priority, laches, and unclean hands. The district court denied the motion.

In the jury instructions, the district court explained:

> A party may claim priority in a mark based on the first use date of a similar but technically distinct mark where the previously used mark is the legal equivalent of the mark in question or indistinguishable therefrom such that consumers consider both as the same mark. This is called "tacking." The marks must create the same, continuing commercial impression, and the later mark should not materially differ from or alter the character of the mark attempted to be tacked.

HFI had proposed a similar instruction and did not object. Moreover, in its closing argument, **[*11]** HFI argued that tacking was inapplicable because the Bank and the Club had "completely different" names.

The jury found that the Bank had "used its mark in commerce in the United States beginning prior to April 1, 1995, and continuously since that date." It also found, in its advisory capacity, that the Bank had proven its laches defense, but not its unclean hands defense. The court subsequently issued findings of fact and conclusions of law, determining, among other things, that HFI's claims were barred by both laches and unclean hands.

After the district court issued its decision, HFI renewed its motion for judgment as a matter of law and moved for a new trial, challenging the priority verdict as well as the laches and unclean hands decisions. The district court denied the motion, noting that HFI had failed to cite any supporting legal authority. It also rejected HFI's motion on the merits, noting that: (a) we had previously remanded the case for trial on the priority issue; (b) there was sufficient evidence to support the jury's verdict on priority; and (c) the court had given a tacking instruction similar to the

---

[4]   As the district court recognized, HFI was, in essence, improperly seeking a dispositive ruling on trademark priority through a motion in limine. **HN3** "A motion in limine is a procedural mechanism to limit in advance testimony or evidence in a particular area." *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009) (citation omitted); *see also Goodman v. Las Vegas Metro. Police Dep't*, No. 2:11-cv-1447-MMD-CWH, __ F. Supp. 2d __, 2013 U.S. Dist. LEXIS 108730, 2013 WL 4006159, at *4 (D. Nev. Aug. 2, 2013) (setting forth the standards applicable to motions in limine). A motion in limine is not the proper vehicle for seeking **[*10]** a dispositive ruling on a claim, particularly after the deadline for filing such motions has passed. *See Dubner v. City & Cnty. of S.F.*, 266 F.3d 959, 968 (9th Cir. 2001).

2013 U.S. App. LEXIS 23507, *11

one HFI had requested. HFI now appeals, and we have jurisdiction pursuant **[*12]** to *28 U.S.C. § 1291*.

II

**HN4** We review the district court's decision to deny a motion for judgment as a matter of law de novo. *First Nat'l Mortg. Co. v. Fed. Realty Inv. Trust*, 631 F.3d 1058, 1067 (9th Cir. 2011). In doing so, however, we must "view the evidence in the light most favorable to the party in whose favor the jury returned a verdict and draw all reasonable inferences in its favor." *Id*. "The verdict will be upheld if it is supported by substantial evidence, even if it is also possible to draw a contrary conclusion." *Id*. (internal quotation marks omitted).

III

**HN5** "It is axiomatic in trademark law that the standard test of ownership is priority of use." *Brookfield Commc'ns, Inc. v. W. Coast Entmt. Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999) (quoting *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996)). "To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Id*. Here, the priority issue turns on whether it was permissible for the jury to find that the Bank could "tack" its use of its present **[*13]** "Hana Bank" mark to its use of the Club mark beginning in 1994.

**HN6** A trademark user may "tack" the date of the user's first use of an earlier mark onto a subsequent mark to establish priority where the "two marks are so similar that consumers generally would regard them as essentially the same." *Id. at 1048*. "Tacking" is permitted because "[w]ithout tacking, a trademark owner's priority in his mark would be reduced each time he made the slightest alteration to the mark, which would discourage him from altering the mark in response to changing consumer preferences, evolving aesthetic developments, or new advertising and marketing styles." *Id*. Moreover, "[g]iving the trademark owner the same rights in the new mark as he has in the old helps to protect source-identifying trademarks from appropriation by competitors and thus furthers the trademark law's objective of reducing the costs that customers incur in shopping and making purchasing decisions." *Id*.

**HN7** The fact that a mark contains a portion of an earlier mark is not sufficient to establish tacking; a tacking analysis must consider the marks "*in their entirety* to determine whether each conveys the same commercial impression" such that they **[*14]** "possess the same connotation in context." *Van Dyne-Crotty, Inc. v. Wear-Guard Corp.*, 926 F.2d 1156, 1160 (Fed. Cir. 1991). "The 'commercial impression' of a trademark is the meaning or idea it conveys or the mental reaction it evokes." *See* Gideon Mark & Jacob Jacoby, *Continuing Commercial Impression: Applications and Measurement*, *10 Marq. Intell. Prop. L. Rev. 433, 434 (2006)* (citing *Spice Islands, Inc. v. Frank Tea & Spice Co.*, 505 F.2d 1293, 1296 (C.C.P.A. 1974)). "'Commercial impression,' like most issues in trademark law, should be determined from the perspective of the ordinary purchaser of these kinds of goods or services." 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 17:26 (4th ed. 2013) [hereinafter, "*McCarthy*"]. In determining whether the marks have the same commercial impression, the visual or aural appearance may be instructive. *See Van Dyne-Crotty*, 926 F.2d at 1159. Commercial impression, however, should be resolved by considering a range of evidence, ideally including consumer survey evidence. *See* Mark & Jacoby, *supra*, at 457; *McCarthy* § 17:26. In our circuit, whether consumers would con-

2013 U.S. App. LEXIS 23507, *14

sider the two marks as being essentially the same is a question  [*15] of fact.[5] *One Indus.*, 578 F.3d at 1160.

Like our sister circuits, we have indicated that **HN9** tacking applies only in "exceptionally narrow" circumstances. *Brookfield*, 174 F.3d at 1047-48. We have explained:

> The standard for tacking . . . is exceedingly strict: The marks must create the *same, continuing commercial impression*, and the later mark should not materially differ from or alter the character of the mark attempted to be tacked. In other words, the previously used mark must be the *legal equivalent* of the  [*16] mark in question or indistinguishable therefrom, and the consumer should consider both as the same mark. This standard is considerably higher than the standard for likelihood of confusion.

*Id*. at 1048 (citations and internal quotation marks omitted).

Our decisions demonstrate the narrowness of the doctrine. In *Brookfield*, 174 F.3d at 1048-49, we reversed the district court's denial of a preliminary injunction based in part on the fact that the plaintiff had failed to make a sufficient showing that it could tack "The Movie Buff's Movie Store" onto its later mark, "moviebuff.com." In *Quiksilver*, 466 F.3d at 759-60, we reversed the district court's decision finding that tacking applied and remanded where there was "evidence from which a reasonable jury could easily conclude that 'QUIKSILVER ROXY' and 'ROXY' did not create the 'same, continuing commercial impression' at the time the 'ROXY' brand was introduced." In *One Industries*, 578 F.3d at 1161-62, we found that the district court correctly determined that the plaintiff could not satisfy the tacking test where its angular "O'" mark was materially different from its rounded "O'" mark.[6]

Further underscoring the limited reach of the doctrine, we have repeatedly cited a group of out-of-circuit cases where a court or the Trademark Trial and Appeal Board found that the doctrine did not apply. *One Indus.*, 578 F.3d at 1161 (collecting cases); *Brookfield*, 174 F.3d at 1048-49 (collecting cases). This group of decisions[7] emphasizes the narrowness of the tacking doctrine, which is why we previously acknowledged them with approval. They do not, however, support HFI's position in this case as strongly as it might appear at first glance. For example, in *Key-Corp v. Key Bank & Trust*, 99 F. Supp. 2d 814, 820 (N.D. Ohio 2000), the court determined that "KEY FEDERAL SAVINGS & LOAN ASSOCIATION," "KEY FEDERAL SAVINGS BANK," and "KEY BANK & TRUST" were "substantially different" and the defendant could not

---

[5]   This is the subject of a circuit split. The Federal and Sixth Circuits evaluate tacking as a question of law consistent with their view that the analogous trademark issue of likelihood of consumer confusion is a question of law. *See Quiksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 759 (9th Cir. 2006). *HN8* As we view likelihood of confusion as a question of fact, we have also determined that tacking presents a question of fact. *Id*. Although the other circuits have not decided the issue yet, the district courts in circuits where likelihood of confusion is a question of fact also treat tacking as a question of fact. *See, e.g., Specht v. Google Inc.*, 758 F. Supp. 2d 570, 583 (N.D. Ill. 2010).

[6]   In *One Industries*, we affirmed despite the fact that  [*17] the plaintiff did not have the benefit of discovery or other factual development. *Id*. at 1160. However, as we explained, the plaintiff had "acquiesced" to resolving the tacking issue on the pre-discovery motion for a more definite statement by failing to object. *Id*. at 1160 & n.1.

[7]   *See Van Dyne-Crotty*, 926 F.2d at 1160 (determining that "CLOTHES THAT WORK" was not the legal equivalent of "CLOTHES THAT WORK. FOR THE WORK YOU DO" for tacking purposes); *Am. Paging Inc. v. Am. Mobilphone Inc.*, 13 U.S.P.Q.2d 2036, 2038-39 (T.T.A.B. 1989) (finding that "AMERICAN MOBILPHONE" and "AMERICAN MOBILPHONE PAGING" were not legal equivalents), *aff'd* 923 F.2d 869 (Fed. Cir. 1990). The other cases involved graphically distinctive marks, and accordingly, offer less guidance here as the graphical aspect of the marks (i.e., the dancing man logo) did not change. *See Data Concepts, Inc. v. Digital Consulting, Inc.*, 150 F.3d 620, 624 (6th Cir. 1998) (noting that "the two marks do not look alike"); *see also* 3 McCarthy § 17:27 (displaying the logo at issue in *Data Concepts*); *Pro-Cuts v. Schilz-Price Enters. Inc.*, 27 U.S.P.Q.2d 1224, 1227 (T.T.A.B. 1993)  [*19] (displaying images of the marks and remarking that there was "a very material difference between them because of their different design features").

2013 U.S. App. LEXIS 23507, *19

rely on tacking to establish priority. The court observed that the defendant had changed its name in order **[*18]** to disassociate itself from the savings and loan scandals of the 1980s and indicate changes in its legal status. *Id*. Accordingly, the court found the defendant's "claim that its name changes were not noticeable to customers [to be] somewhat disingenuous given that at least its first name change was made in the *hope* that its customers would distinguish its former name from its new one." *Id*.

In contrast, we have cited *Hess's of Allentown, Inc. v. National Bellas Hess, Inc*., 169 U.S.P.Q. 673 (T.T.A.B. 1971), as an example of a case where tacking was appropriate. *See One Indus*., 578 F.3d at 1161; *Brookfield*, 174 F.3d at 1048. In *Hess's*, the petitioner had originally incorporated and conducted business as "Hess Brothers," but later changed its name to "Hess's of Allentown, Inc.," while emphasizing and promoting itself as "Hess" or "Hess's." *Hess's of Allentown*, 169 U.S.P.Q. at 674-75. The Board found that there could be "no question but that 'HESS' is the most significant portion of the trade name 'HESS BROTHERS' and that it is this portion which petitioner has emphasized throughout the years and that portion by which it has been recognized and referred to within and without its corporate structure." *Id*. at 677. There could be "no distinction for legal or practical purposes" between "Hess" and "Hess's," particularly given that the record indicated that the petitioner changed the name "to reflect the manner in which the purchasing **[*20]** public had come to refer to and identify its store and operations." *Id*.[8]

Here, reasonable minds could disagree on whether the Bank's marks were materially different. In isolation, the words "Hana Overseas Korean Club," "Hana World Center," and "Hana Bank" seem aurally and visually distinguishable. It is not necessarily clear from their names that these entities offer the same services. Moreover, there was no survey evidence indicating that the marks convey the same, continuing commercial impression.[9]

*HN10* That the evidence could be construed to support HFI's position, however, is not enough for it to prevail. As the losing party in a jury trial, HFI must show that its interpretation of the evidence is the only reasonable one. *See Martin v. Cal. Dep't of Vet. Affairs*, 560 F.3d 1042, 1046 (9th Cir. 2009). Here, HFI has not satisfied that standard. *HN11* Tacking requires a highly fact-sensitive inquiry, and the jury decided the issue after receiving an instruction that correctly conveyed the narrowness of the doctrine. In this respect, our characterization of tacking as a question of fact is arguably dispositive. *Cf. Van Dyne-Crotty*, 926 F.2d at 1159 (observing that *HN12* in the Federal Circuit, a determination that two marks are not legal equivalents is a legal determination that is not entitled to deference).

The evidence showed that the Bank offered financial services to Korean-speaking American consumers. It advertised in Korean-language newspapers, including the name "Hana Overseas Korean Club" in English next to its "Hana Bank" mark in Korean. Its distinctive dancing man logo — which has not changed — appeared in all of the advertisements. The **[*22]** application forms contained similar information. The ordinary purchasers of the Bank's services were likely aware of the Bank and its services from their experiences in Korea, given that by 1994, it had been known as "Hana Bank" for several years.

---

[8]  Similarly, in *American Security Bank v. American Security & Trust Co*., 571 F.2d 564, 567 (C.C.P.A. 1978), the court concluded that "AMERICAN SECURITY" and "AMERICAN SECURITY BANK" were legally equivalent because "the word 'bank' is purely descriptive and adds nothing to the origin-indicating significance of AMERICAN SECURITY."

[9]  At oral argument, the Bank's counsel agreed that survey evidence would have been useful, but indicated that it was not possible for the Bank — which had been contending that its marks were the same — to gather such evidence because HFI did not suggest that the Bank's marks were materially different and that the Bank could not rely on tacking until the "eleventh hour." **[*21]** As noted above, the record supports that assessment.

2013 U.S. App. LEXIS 23507, *22

The jury could have reasonably concluded that the ordinary purchasers of the financial services at issue likely had a consistent, continuous commercial impression of the services the Bank offered and their origin. The ordinary purchasers of these services were Korean-speaking consumers (consisting of Korean expatriates and Korean Americans) that likely had a preexisting awareness of the Bank due to its ongoing business presence in Korea. The jury could have reasonably concluded that these purchasers associated "Hana Bank" with the "Hana Overseas Korean Club" when "Hana Overseas Korean Club" appeared, in English, next to "Hana Bank," in Korean, and the dancing man logo in the advertisements. In that context, "Hana" was arguably the most significant portion of the trade name, as the ordinary purchasers would have then made the association between the English word "Hana" and the Bank's Korean name. *See Hess's of Allentown, 169 U.S.P.Q. at 677.* [*23] Thus, they would have regarded the Bank's name as "Hana Bank" in English rather than some other possible translation, such as "One Bank."[10] "Overseas Korean Club" and "World Center" would then be non-essential as they merely conveyed what the ordinary purchasers would have already surmised: that the well-known Korean bank was offering financial services to individuals like them living outside of Korea. *Cf. Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 955 (7th Cir. 1992)* (concluding that the dropping of non-essential words which did not change the buyers' "basic, overall commercial impression" did not constitute abandonment).

In light of this combination of facts, the jury could reasonably conclude that throughout the time period at issue, the ordinary purchasers of these services had the continuous impression that the advertised services were being offered by the Bank and that there were no material differences between the marks. In other words, viewing the marks in context and in their entirety, the ordinary purchasers could perceive them as conveying the same idea or meaning or evoking the same mental reaction. Consequently, there was sufficient evidence to support the jury's verdict on trademark priority.

At oral argument, HFI's counsel further argued that if the Bank were to prevail, it would create uncertainty because there would have been no way for an entity like HFI to learn about the Bank's mark without expending significant resources. **HN13** The registration process is the typical means for determining whether there is a preexisting mark. It is well-settled, however, that registration is not necessarily dispositive of ownership. *See Brookfield, 174 F.3d at 1047* (indicating that registration is prima facie evidence of the validity of the [*25] registered mark, but it may be rebutted by establishing priority of use). To the extent that the resulting uncertainty is a problem, it already exists. In any event, this abstract concern is irrelevant in this case given that HFI actually knew about the Bank's mark and its activities in the United States.

IV

HFI also argues that the Bank "abandoned" the Club's mark in 1999 or 2000. **HN14** A trademark owner loses its exclusive rights if it fails to actually use the mark. *Sands, Taylor & Wood, 978 F.2d at 954-55* (citing *15 U.S.C. § 1127*). "To show abandonment by nonuse, the party claiming abandonment must prove both the trademark owner's (1) 'discontinuance of trademark use' and (2) 'intent not to resume such use.'" *Grocery Outlet Inc. v. Albertson's Inc., 497 F.3d 949, 951 (9th Cir. 2007)* (citation omitted). "So long as the owner continues use of the 'key element' of the registered mark, courts generally will not find abandonment." *Sands, Taylor & Wood, 978 F.2d*

---

[10]   The Bank invokes the doctrine of foreign equivalents in support of its arguments. That doctrine is typically used to translate foreign words into English for the purposes of determining the likelihood that the foreign-language mark will be confused with an English-language mark, as well as determining whether it is generic or descriptive. *See 4 McCarthy* § 23:36. We need not determine whether the doctrine applies in the tacking context as there was sufficient evidence to support the jury's implicit finding that the Bank's marks created a consistent [*24] commercial impression regardless of the doctrine's applicability.

at 955 (citation omitted).

There was evidence at trial that the Bank maintained customers in the United States from 1994 through the present and made wire transfers nearly every day. HFI may be referring to the fact that the Club's name  **[*26]**  changed in 2000 to the "Hana World Center." This argument was at least implicitly considered and rejected by the jury as part of its evaluation of HFI's tacking argument. Accordingly, for the same reasons that we find HFI's tacking arguments unavailing, we also reject HFI's abandonment argument.

V

We reiterate that ***HN15*** tacking applies only in rare circumstances and our decision here does not alter the strict tacking standard. But the fact that the doctrine rarely applies does not mean that it never will. Indeed, the tacking doctrine exists for compelling reasons: to protect consumers from being misled about the source of products and facilitate their purchasing decisions. In our circuit, tacking presents a question of fact that must ultimately be decided by the jury unless the evidence is so strong that it permits only one conclusion. In this case, the district court properly instructed the jury and allowed it to decide the issue. HFI has not shown that the jury's decision was unreasonable. While other courts, which consider tacking a question of law, might reach a different conclusion on these facts, we are bound by our decisions holding that tacking is a question of fact. We accordingly  **[*27]**  affirm the district court's decision denying HFI's motion for judgment as a matter of law on trademark priority and uphold the jury's verdict. In light of our conclusion on trademark priority, we need not and do not reach the Bank's equitable defenses.[11]

**AFFIRMED.**

---

[11]   We note that HFI specifically requested that we rule on trademark priority as it may have continuing relevance to the parties.